# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROYALE GOLD RUNYON,

        Defendant-Appellant.

UNPUBLISHED
May 21, 2015

No. 320647
Kent Circuit Court
LC No. 13-005950-FC

Before: DONOFRIO, P.J., and O'CONNELL and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Royale Gold Runyon, appeals as of right his convictions, following a jury trial, of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Runyon to serve 30 to 90 years' imprisonment for his second-degree murder conviction and a consecutive term of 2 years' imprisonment for his felony-firearm conviction. We affirm.

## I. FACTS

At around 3:00 a.m. on December 20, 2012, Mahdi Hayes was killed by a gunshot to the back of the head. Hayes was Runyon's older brother. Darrell Dehaan identified the gun used in the murder as a gun stolen from his house on December 5, 2012. In the week before Hayes's death, the gun was used in other incidents.

John Breslin testified that on December 14, 2012, Runyon and another man attempted to rob him in Grand Rapids. Runyon stopped Breslin on the street and told him to give Runyon his valuables. Breslin ran toward a nearby house, heard a gunshot, and collapsed on the front porch. The shot did not hit Breslin, and he believed that Runyon shot at him. However, Runyon testified that Hayes shot at Breslin. Ron Fleming, a friend of Runyon, testified that Runyon later told him that he "shot a white guy on a porch."

Early in the morning on December 15, 2012, the same gun was used to kill Evevana Galloway, Hayes's ex-girlfriend. Andrea Pate, Galloway's neighbor, testified that Evevana's car tires were slashed on December 14, 2012. According to Pate, she heard a gunshot at about 4:00 a.m., got out of bed, looked out her window, and saw a four-door silver Ford Taurus leave the apartment complex "in a hurry." Ebony Betts testified that she lent Hayes her silver Ford Taurus in the early morning on December 15, 2012, and Hayes returned her car at around 4:30 a.m.

-1-

According to Evelyn Galloway, Evevana's mother, she tried to call Evevana multiple times on the morning of December 15, 2012, but there was no answer. Evelyn eventually called a neighbor to check on Evevana, and the neighbor found Evevana dead. When Evelyn called Hayes to inform him that someone had killed Evevana, she heard someone tell Hayes to "[g]et off the phone" and stop talking to "her mother." Hayes called her back later and indicated that he and his brother did not know anything about the murder.

Detective Mark Worch testified that there was no evidence of forced entry into Evevana's apartment. According to Worch, Evevana's sister stated that Evevana usually kept a key under the mat outside of her apartment but the key was missing. Worch interviewed Hayes in connection with the killing because Hayes was a possible suspect, and Hayes denied driving a silver Taurus or knowing anyone that owned one. Worch eventually recovered the key from Runyon's property.

According to Wintana Tekle, on December 19, 2012, she was at an adult foster care home run by Runyon's aunt, Vickie Runyon. Runyon and Hayes arrived at the group home at some point and later left together. Fleming, who worked at the group home, testified that the last time he saw Hayes was when Hayes and Runyon left together to go to an ATM. Both Tekle and Fleming testified that Runyon returned to the group home alone and left again later in the evening, saying that he was going to meet Hayes to receive some money.

Runyon testified that he and Hayes visited an ATM at about 12:30 a.m. to withdraw money to pay Runyon's court fines. They went back to the ATM at about 2:00 a.m., but Hayes was unable to withdraw more money. According to Runyon, Hayes told him that he would call Runyon later if he was able to withdraw money again. Hayes called Runyon later that night and asked Runyon to meet him at the end of an alley to go to an ATM together. Runyon was listening to loud music in his headphones and did not hear a gunshot. When he spotted Hayes lying in the alley, he thought that Hayes was "playing around," but then he noticed that Hayes was not moving. Runyon started crying and screaming for help. According to Runyon, he crouched down next to Hayes and noticed a gun next to his body. He thought it was Hayes's gun, so he picked it up and put it in his waistband.

Dawnn Burrell, a neighbor, testified that she heard a gunshot at 2:57 a.m. Fitzpatrick Williams testified that he was doing dishes in his home in the early morning hours when he heard a gunshot. According to Williams, he looked out his window and saw a shadow running in an alley by his home, then heard someone screaming that someone had killed his brother. Williams ran to Runyon and asked what had happened, and Runyon responded that he was supposed to meet Hayes but someone had shot him. Williams told Runyon to go to Vickie Runyon's house and wait until the police arrived, and Runyon left. Runyon testified that he left because he was very upset and could not stay there any longer.

According to Fleming, about ten minutes after Runyon left the group home, he called Fleming and said, "They got my brother. My brother is dead." Fleming testified that he ran out of the group home to find Runyon, and while he was running down the street, he saw Runyon running or briskly walking in the other direction. When Fleming called out Runyon's name, Runyon pulled out a gun and told him not to come any closer. Runyon testified that he aimed the gun at Fleming because he was frightened.

Tekle testified that Runyon arrived at the group home after Fleming left. According to Tekle, Runyon was crying. He pulled out a gun, set it on the table, and stated that he found his brother dead. Runyon wiped the gun off with a sweater and then told Tekle to put it behind the group home. Runyon testified that he hid the gun because he thought he "dug [himself] in a hole by taking the gun from the scene" and "what would it look like if I pop up at a murder scene with a gun in my hand."

Dr. David Start, a forensic pathologist, testified that he later performed an autopsy of Hayes's body. Hayes was shot in the back of the head and his hooded jacket also had a "defect" consistent with the location of the gunshot wound. Dr. Start testified that Hayes's injury was "uniformly lethal" and "nonsurvivable."

Officer Aaron Westrick testified that when he was securing the murder scene, Runyon approached him and indicated that he was Hayes's brother. Westrick transported Runyon to the police station. Detective Timothy DeVries testified that he interviewed Runyon at about 5:30 a.m. and that Runyon was "calm" throughout the interview. According to DeVries, Runyon had some of Hayes's property, including Hayes's cell phone and wallet. Runyon had about $280 with him that he indicated he and Hayes had withdrawn from the ATM earlier in the evening.

Detective DeVries testified that bank records showed that Runyon withdrew a further $200 from Hayes's account at 3:06 p.m. on December 20, 2012. Runyon paid his court fines in full by 3:51 p.m. Also on December 20, 2012, Detective James Jorgensen testified that Breslin identified Runyon in a photographic lineup. Detective Jorgensen testified that he circulated a notice among patrol officers that there was probable cause to arrest Runyon.

Edgar Torres testified that he was with Runyon on the afternoon of December 20, 2012. According to Torres, they created and purchased t-shirts for a vigil that was to be held for Hayes that evening. Runyon used Hayes's debit card to withdraw money. Torres also testified that Runyon indicated he was carrying a gun in his waistband that had "two bodies" on it. When Torres asked whose bodies were on the gun, Runyon said it was "better left unsaid."

Dwayne Moore testified that he, Runyon, and Angel Hardy drove to a vigil that was to be held in the alley where Hayes was shot. Moore testified that they noticed police cruisers in the alley when they arrived. Hardy testified Runyon gave her a gun, which she hid underneath her clothing. According to Hardy, Runyon said the gun was "hot" and "had a couple bodies on it." Officers arrested Runyon at the vigil.

Officer Sean McCamman testified that he was patrolling the area where Hayes was killed when he noticed about 15 people gathered at the alley, including Runyon. According to McCamman, he got out of his patrol vehicle, confirmed Runyon's identity, and arrested him. Runyon asked why he was being arrested, and McCamman stated that it was in connection with an armed robbery. According to McCamman, Runyon then shouted at the group, "They think I killed my brother." Officer Justin Kribs was also present at the arrest and testified that Runyon's behavior seemed inappropriate because "he was being arrested at the vigil for his brother who was just killed within 24 hours, and he was not upset. He was very calm."

Hardy testified that she took the gun home with her and hid it. Police recovered the gun on December 25, 2012, after Hardy was arrested for committing multiple armed robberies. Ballistic evidence connected the gun with Hayes's murder, Evevana's murder, and Breslin's attempted robbery.

## II. OTHER-ACTS EVIDENCE

Runyon contends that the trial court erred by admitting evidence of Breslin's attempted robbery and Evevana's murder. We conclude that Runyon has waived these issues.

Generally, MRE 404(b)(1) prohibits a party from introducing propensity evidence of another party's other crimes, wrongs, or acts. However, a party may not "create[] the very error that it wishes to correct on appeal[.]" *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010). A waiver is an intentional abandonment or relinquishment of a known right. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). A defendant waives a right by expressly approving of the trial court's action. *Id*. at 216. This "constitutes a waiver that *extinguishes* any error." *Id*. at 215.

In this case, the parties discussed the admissibility of the other-acts evidence before trial. The prosecution indicated on the record that the parties had agreed to admit the evidence. Defense counsel agreed. The trial court stated, "All right, as I understand it, this is evidence which may cut with two edges, and each side has something they may want to make out of it. That being the case, there doesn't seem to be any controversy about it . . . ." We conclude that defense counsel's express approval of admitting the other-acts evidence was a waiver that extinguished any error.

## III. INEFFECTIVE ASSISTANCE

Runyon contends that defense counsel rendered ineffective assistance by failing to challenge admission of the other-acts evidence in this case. We disagree.

A criminal defendant has the fundamental right to the effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984). Generally, this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of law regarding a defendant's ineffective assistance of counsel claim. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). But a defendant must move the trial court for a new trial or evidentiary hearing to preserve a claim that counsel was ineffective. *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

In this case, Runyon did not preserve his ineffective assistance of counsel claim because he did not move for a new trial or evidentiary hearing. Accordingly, this claim is unpreserved. When the trial court has not conducted a hearing to determine whether a defendant's counsel was ineffective, our review is limited to mistakes apparent from the record. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

To prove that defense counsel was not effective, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that counsel's deficient performance prejudiced the defendant. *People v Pickens*, 446

Mich 298, 302-303; 521 NW2d 797 (1994). The defendant must overcome the strong presumption that counsel used sound trial strategy. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). We give defense counsel wide discretion in matters of trial strategy because counsel may be required to take calculated risks to win a case. *Pickens*, 446 Mich at 325.

We conclude that counsel's decision to waive any challenges to admission of the other-acts evidence regarding Breslin and Evevana was objectively reasonable. When considering an unpreserved claim of ineffective assistance of counsel, we must consider the possible reasons for counsel's actions. *Vaughn*, 491 Mich at 670; *Cullen v Pinholster*, 563 US ___, ___; 131 S Ct 1388, 1407; 179 L Ed 2d 557, 578 (2011). We will not substitute our judgment for that of defense counsel or review this issue with the benefit of hindsight. *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007).

In this case, there were ways that counsel could reasonably argue the evidence in Runyon's favor. Runyon told several people that he took the gun from near Hayes's body because he believed it was Hayes's gun. Runyon also told people that the gun had "two bodies on it." The evidence that Runyon believed that Hayes had shot and killed Breslin on a porch and had also killed Evevana with the same gun was potentially exculpatory because, without this evidence, a reasonable inference from Runyon's statement was that one of the "bodies" involved with the gun was Hayes's. With admission of the other-acts evidence, defense counsel could explain Runyon's "two bodies" statement in a way that did not inculpate Runyon in Hayes's murder—that is, defense counsel could argue that Runyon believed Hayes had used the gun to kill Breslin and Evevana. Defense counsel could also argue that since Runyon believed that Hayes's gun was linked to two killings, this also tended to make Runyon's statements about why he took the gun from Hayes's body more credible.

We must presume that counsel engaged in a reasonable trial strategy. Ultimately, the admission of the other-acts evidence presented a calculated risk on the part of defense counsel. In the words of the trial court, the evidence cut both ways. We conclude that defense counsel had objectively reasonable, strategic reasons to not challenge admission of the other-acts evidence.

## IV. SUFFICIENCY OF THE EVIDENCE

Runyon contends that the evidence was not sufficient to support the jury's verdict regarding malice and his identity as the shooter. We disagree.

A claim that the evidence was insufficient to convict a defendant invokes that defendant's constitutional right to due process of law. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992); *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970). Thus, this Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution proved the crime's elements beyond a reasonable doubt. *Id*.

The crime of second-degree murder has four elements: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457

Mich 442, 463-464; 579 NW2d 868 (1998). Malice includes the intent to kill, the intent to cause great bodily harm, or the intent to take an action whose natural tendency is to cause death or great bodily harm, wantonly and willfully disregarding that risk. *Id*. at 464. Further, "identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

We conclude that the prosecution presented sufficient evidence of the shooter's malice. In this case, Dr. Smith testified that Hayes was shot in the back of the head. Dr. Smith testified that this kind of injury is "uniformly lethal" and "nonsurvivable." That the person who shot Hayes used a deadly weapon on a vital location supports a reasonable inference that the shooter intended to kill Hayes.

Further, we conclude that sufficient evidence supported Runyon's identification as the shooter. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). We must resolve any conflicts in the evidence in the prosecution's favor. *Id*. at 619.

In this case, Runyon was the last person to see Hayes alive and the first person to see him dead. Runyon was supposed to meet Hayes in the alley in which he was shot. Runyon claimed not to hear a gunshot. After he found Hayes, he removed Hayes's cell phone and wallet. He also left the scene and hid the murder weapon before returning. Runyon gave inconsistent statements to the police. The day after Hayes's murder, Runyon used Hayes's debit card to pay off his personal court fines. Runyon was also described as oddly calm when arrested at his brother's vigil, and he assumed that police were arresting him for his brother's death. Viewing this evidence in the light most favorable to the prosecution, we conclude that rational jurors could conclude beyond a reasonable doubt that Runyon was the person who shot Hayes.

## V. SENTENCING

Runyon contends that the trial court erroneously scored Prior Record Variable (PRV) 7, which concerns concurrent or subsequent felony convictions. We disagree.

The trial court properly scores PRV 7 when a defendant "was convicted of a felony after the sentencing offense was committed." MCL 777.57(2)(a). The trial court properly assesses 20 points under PRV 7 when a defendant has "2 or more subsequent or concurrent felony convictions." MCL 777.57(a)(1). An offense is a subsequent offense if the defendant "was convicted of a felony *after the sentencing offense was committed*." MCL 777.57(2)(a) (emphasis added).

In this case, Runyon committed the offense on December 20, 2012. In September 2013, Runyon was convicted of two additional felonies—assault with intent to rob while armed and assault with intent to commit murder—in connection with Breslin's robbery. Because Runyon was convicted of two felonies after Runyon committed the sentencing offense, we conclude that the trial court properly assessed 20 points under PRV 7.

We affirm.

/s/ Pat M. Donofrio
/s/ Peter D. O'Connell
/s/ Amy Ronayne Krause